**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MARIE ELAINE REYNOLDS and** | | |
| **THEODORE HARRIS, III,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-2692-STA-cgc** |
| | ) | |
| **FEDERAL EXPRESS CORPORATION** | ) | |
| **d/b/a FEDEX EXPRESS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

Before the Court is Defendant's Motion for Summary Judgment (D.E.# 43), filed on May 4, 2011. Plaintiffs filed a Response (D.E. # 76) on March 5, 2012,[1] and a Supplemental Response (D.E. # 68) on November 14, 2011. Defendant filed a Reply (D.E. # 50) on July 1, 2011, and a Supplemental Reply (D.E. # 69) on December 1, 2011. Plaintiffs filed a Sur-Reply (D.E.# 55) on July 25, 2011, and a Supplemental Sur-Reply (D.E. # 72) on December 8, 2011. For the following reasons, Defendant's Motion is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Plaintiffs filed their original Response on June 14, 2011 (D.E. # 46), but the Court struck it on February 24, 2012 (D.E. # 75) for failure to comply with the Local Rules' font-size requirement and the Court's page limitation. Plaintiffs re-filed a Response memorandum in compliance with these requirements, and it is this Response upon which the Court relies. Plaintiffs' remaining documents filed as attachments to their Response were not stricken, and the Court will cite to those as necessary.

## BACKGROUND

Defendant employed Plaintiffs in its Airbus workgroup at the Federal Express ("FedEx") in Memphis, Tennessee. Plaintiffs filed their Complaint alleging violations of 42 U.S.C. § 1981 for disparate treatment and retaliation, Title VII of the Civil Rights Act ("Title VII") for disparate treatment and retaliation, and the Fair Labor Standards Act ("FLSA") for failing to pay overtime compensation. (Compl. at 11-12.) After Defendant filed its Answer (D.E. # 4) on December 4, 2009, it filed a Motion for Partial Summary Judgment on Plaintiffs' FLSA claim, which the Court granted on March 19, 2010 (D.E. # 15). Therefore, the claims remaining before the Court are Plaintiffs' § 1981 and Title VII claims.

After Defendant amended its answer on February 8, 2011 (D.E. # 41), it filed the Motion for Summary Judgment now before the Court (D.E. # 43) on May 4, 2011. After the parties completed briefing the Motion, Plaintiffs filed a Motion to Reopen Discovery, which the Magistrate Judge granted as to the issue of one of Defendant's employees being told not to incriminate a FedEx manager. (D.E. # 58, 66.) After the parties completed the additional discovery, they filed supplemental briefing with the Court. (D.E. # 68-69, 72.)

The following facts are undisputed for purposes of this Motion unless otherwise noted. Plaintiff Reynolds is a white female who worked for Defendant on two separate occasions: from 1995 to 2004 and from 2006 to 2008. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 1.) Plaintiff Harris is a black male who worked for Defendant on three separate occasions: for three months in 1999, from 2000 to 2002, and from 2005 to 2008. (*Id.* at 2.) From 2005-2008, Plaintiff Harris worked as a Senior Maintenance Planner.

### Defendant's Employment Agreement and Policies

When Plaintiffs applied for a job with Defendant in 2005 and 2006 respectively, they signed an Employment Agreement. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 1-2.) Defendant submits that neither Plaintiff Reynolds nor Plaintiff Harris had questions about the Employment Agreement when they signed it. (*Id.* at 1-2.) The Employment Agreement provided to Plaintiff Harris contained the following statute of limitations: "To the extent the law allows an employee to bring legal action against [Defendant], I agree to bring that complaint within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever comes first." (*Id.* at 1-2.) Defendant asserts that Plaintiff Reynolds' Employment Agreement contained the same six-month statute of limitations as that found in Plaintiff Harris' Employment Agreement. (*Id.* at 1.)

Plaintiffs dispute this fact and point out that Plaintiff did not question the statute of limitations because she did not recall seeing the provision in the Employment Agreement. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 2.) Additionally, Plaintiff Reynolds' Employment Agreement appears to contain an eight-month statute of limitations provision instead of a six-month period. (*Id.*; Employment Agreement, D.E. # 46-3, at 8.) Moreover, Plaintiff Reynolds and Plaintiff Harris were not asked if they had questions about the Employment Agreement, and Defendant did not allow Plaintiffs to keep a copy of the Employment Agreement. (*Id.* at 2-3.) Plaintiff Reynolds stated that Defendant "is the largest airline in Memphis and the pay and benefits are superior to any other airline in Memphis." (*Id.* at 2.)

Both Plaintiffs were provided copies of Defendant's employee handbook, and they were familiar with Defendant's employment policies. (Def.'s Statement of Undisputed Facts, D.E. #

43-2, at 2.) Plaintiffs had experience with Defendant's attendance policy as well.[2] (*Id.* at 2-3.)

Plaintiffs were also aware of Defendant's internal grievance procedures which allowed

employees to complain if they felt that they were the victims of discrimination or harassment.

(*Id.* at 3.) Plaintiffs dispute the effectiveness of this internal procedure. (Pls.' Resp. to Def.'s

Facts, D.E. # 46-1, at 4.)

### Plaintiffs' Schedules and Time Worked

Plaintiffs' workgroup coordinated the maintenance of Defendant's Airbus aircraft and

composed the schedules and routes of Defendant's Airbus fleet so that the planes could undergo

required maintenance while still ensuring that Defendant could service its delivery network.

(Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 3.) During the time period relevant to this

case, Plaintiffs worked from approximately 10:30 p.m. to 6:30 a.m. (*Id.*) Plaintiff Harris worked

Tuesday through Saturday, and Plaintiff Reynolds worked Sunday through Thursday. (*Id.*) Thus,

Plaintiff Harris was off on Sunday and Monday, and Plaintiff Reynolds was off Friday and

Saturday. (*Id.*) They worked together on Tuesdays, Wednesdays, and Thursdays. (*Id.*)

Defendant asserts that Plaintiffs could cover each other's routing duties at the Airbus desk on one

of those overlapping days, thereby allowing each of them to have a three-day weekend. (*Id.*)

Plaintiffs add that Defendant required them to arrive at work ten minutes prior to the start

of their shift for a meeting, and Kurt Schafer ("Schafer"), the Airbus planning manager of

---

[2] Plaintiffs object to this fact because it is irrelevant under the Federal Rules of
Evidence and is inadmissible character evidence. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 3.)
Plaintiffs stress that because Defendant rehired both Plaintiffs after they had prior attendance
problems, those problems are irrelevant to the Court's analysis of this case. The Court will rely
on these prior attendance problems solely as support for Defendant's assertion that Plaintiffs had
prior experience with Defendant's attendance policies; therefore, Plaintiffs' objection is
**OVERRULED**.

Plaintiffs' department, would review the work schedule approximately ten times a day. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 5.) As a manager, Schafer was required to know whether his subordinates attended work when they were supposed to. (*Id.* at 5-6.) Defendant points out that Schafer worked from approximately 6:00 a.m. to 2:00 p.m. Monday through Friday, and he did not always notice which employees manned the Airbus computers when he arrived each morning. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 4.) He might not notice that a night shift employee was absent, on a break, or had left fifteen or thirty minutes early. (*Id.*) Plaintiffs dispute this fact because Schafer would attend the shift change meeting promptly at 6:00 a.m. and review the schedule frequently during his shift. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 6-7.) During the night shift, a duty manager was present at the facility, but he oversaw all of the employees working on the night shift. (*Id.* at 7.) The duty manager was not responsible for managing the work schedule of the Airbus workgroup or monitoring employee attendance. (*Id.*)

Defendant gave its Airbus group employees "comp time" for working on their normally scheduled off-days. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 4.) The employees could use the comp time to schedule time off at a later date or they could sell it back to Defendant and receive additional pay. (*Id.*) Additionally, Plaintiffs' workgroup maintained a schedule on an Excel spreadsheet, and Schafer assigned Plaintiff Reynolds and one other employee the task of updating the schedule to reflect employees' use of vacation or comp time. (*Id.*) Plaintiff Reynolds regularly made changes to the schedule. (*Id.*) Plaintiffs add that every employee in the Airbus workgroup had access to the schedule and could freely make changes. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 6.) They point out that Tina Matney ("Matney"), a

router/scheduler working under Schafer, characterized the spread sheet as a "toxic document" which changed constantly and was not trustworthy.  (*Id.*)  Matney stated that the schedule was "not managed by the manager.  It was just a free-for-all amongst the employees." (Dep. of Matney, D.E. # 46-14, at 14.)[3]

**Alleged Improper Conduct**

In mid-June of 2008, Plaintiff Harris approached Schafer with Roger Nallick ("Nallick") and informed Schafer that Nallick was racially harassing him by referring to him as a "scab, piece of shit scab, [and a] scab mother f----r." (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 8.) Nallick had also referred to Plaintiff Harris as "you people" previously and frequently stated that "you people should not be working here." (*Id.* at 9.)  These references to Plaintiff Harris as "you people" occurred for the six to eight months prior to June of 2008.  (Dep. of Harris, D.E. # 46-8, at 26-27.)  Plaintiff Harris and Nallick stated that Nallick did not deny making these statements during a June 2008 meeting with Schafer.  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 8-9.) However, Schafer stated that Nallick denied calling Plaintiff Harris a scab at the mid-June 2008 meeting.  (*Id.* at 9.)

Greg Williams ("Williams"), a white employee who had worked with Plaintiff Harris at another location, crossed the same picket line as Plaintiff Harris, but Nallick never called Williams a scab.  (*Id.*)  However, Defendant points out that Nallick did not know Williams' employment background or whether he had crossed a picket line.  (Dep. of Nallick, D.E. # 46-17, at 12-13, 42-43.)  Nallick has referred to a white coworker as a scab.  (*Id.* at 59.)  Additionally,

_____

[3]       When the Court cites to depositions, it will refer to the ECF page numbers of the filed documents rather than the depositions' page numbers.

when Schafer told Nallick that Defendant did not tolerate discrimination and that Plaintiff Harris should "let it go," Plaintiff Harris felt threatened and believed that Schafer did not intend to do anything about the report. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 16.) One week later, in early July of 2008, Nallick called Plaintiff Harris a n---er at work. (*Id.* at 9, 16.) This incident was the only time Plaintiff Harris heard Nallick use the word "n---er" around him, but Nallick continued to use racial remarks around others. (Dep. of Harris, D.E. # 46-8, at 28-29.) Another coworker told Plaintiff Harris about Nallick's additional comments, but he did not hear Nallick say anything to his face. (*Id.* at 27-29.) Plaintiff Harris heard ten or more comments before May of 2008. (*Id.* at 29.)

In late July of 2008, Plaintiff Reynolds confronted Nallick about the names he called Plaintiff Harris, such as "piece of shit scab," "mother f-----g scab," derogatory statements about Plaintiff Harris's job performance, and Nallick's statement that he could not believe that Plaintiff Harris still worked for Defendant. (*Id.*) Plaintiff Reynolds also told Nallick to speak to Schafer to work out his differences with Plaintiff Harris or she would speak to Schafer herself. (*Id.* at 9-10.) In response, Nallick stated that Plaintiff Harris would "play the race card" to Schafer and nothing would be done. (*Id.* at 10.) Randy Allman ("Allman")and another Airbus workgroup employee heard this conversation and nodded in agreement with Nallick. (*Id.*) Nallick made a three-minute phone call to Schafer the day after this conversation with Plaintiff Reynolds. (*Id.*) In August of 2008, Schafer began to question Plaintiff Reynolds about her whereabouts, which he had not done previously. (*Id.*)

**The Anonymous Letter**

In late August of 2008, Defendant's human resources department received an anonymous letter ("the Letter"), later determined to be sent by Allman , which alleged that Plaintiffs were taking unauthorized time off of work. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 5.) The Letter included a copy of the Airbus workgroup's schedule from February of 2008 until August of 2008, and it alleged that Plaintiffs did not come to work on the nights they were scheduled to work and that they failed to document their days off on the schedule. (*Id.*) The Letter also stated that Schafer knew about the situation but had done nothing to remedy it. (*Id.*)

Plaintiffs do not dispute these facts, but they provide additional background information related to the Letter. According to Plaintiffs, Allman stated that he discussed the contents of Exhibit 1 to his deposition (the Letter) with Nallick and that his schedule overlapped with Nallick's after June 29, 2008. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 8; Dep. of Allman, D.E. # 46-18, at 17-18.) However, Plaintiffs' counsel did not ask whether Allman's discussion with Nallick included the Letter or was limited to the contents of Plaintiffs' schedules from February 2008 through August 2008. (Dep. of Allman, D.E. # 46-18, at 17-18.) In contrast, Nallick stated that he had nothing to do with the Letter and did not know that Allman had drafted the Letter. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1.) Thus, a dispute exists as to how and who drafted the Letter.

### Mike Smith's Investigation of the Anonymous Letter

Defendant states that the Letter accused Schafer of failing to properly manage the workgroup or stop the fraudulent activity related to the schedules. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 5.) Because of these contents, Defendant assigned Schafer's supervisor, Senior Manager Mike Smith ("Smith"), to investigate the Letter. (*Id.*) Plaintiffs

dispute that the Letter contained the specific language asserted by Defendant.[4]  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 10.)  Plaintiffs never heard Smith, his supervisor, or his human resources representative say any racially derogatory comments.[5]  (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 5.)

It is undisputed that Smith made copies of the Airbus workgroup's work schedule and archived copies of the schedule that had been backed up and that he relied on them in his investigation.  (*Id.*)  Smith also relied on historical log-in information from Defendant's IT department reflecting when Plaintiffs had logged into certain computer programs, as well as electronic records from Defendant's security related to when Plaintiffs used their identification badges to access Defendant's secured entry gate or the secured doors of Defendant's facility.  (*Id.* at 5-6.)  Smith obtained records of computer transactions Plaintiffs made while performing their aircraft routing duties and copies of Schafer's notes, written by Plaintiffs, that he passed along to workers on the shift following Plaintiffs' shift.  Smith did not ask Schafer about "any hostilities that existed in the workplace," but he did find out sometime after June 16, 2008, that Plaintiff Harris had complained to Schafer about his treatment in the workplace.  (Dep. of Smith, D.E. # 46-15, at 27-28, 51-52.)

---

[4]      Plaintiffs direct the Court to Exhibit 1 of Allman's Deposition.  However, Plaintiffs failed to include this Exhibit with their Response, and the Court was unable to locate a copy of the Letter in the record.

[5]      Plaintiffs object to this fact because Plaintiffs' knowledge of Defendant's management's use of racist words in the workplace is irrelevant to Plaintiffs' claims of retaliation and disparate treatment.  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 10.)  Plaintiffs state that they had never met upper management before this case and the events underlying it took place and that they have no knowledge of upper management's decorum in the workplace.  (*Id.* at 10-11.)  However, they did not cite to record evidence to support this assertion.  Accordingly, Plaintiffs' objection is **OVERRULED**.

However, Plaintiffs dispute the implication that the copies of the schedules were accurate. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 11.)  They point out that the schedule relied on by Smith contained material discrepancies regarding Allman's schedule and that it was altered to include comp time for Allman on days he was scheduled to work.  (*Id.*)  Plaintiffs' schedules and the electronic schedule used by Defendant also contained discrepancies for the month of August 2008. (*Id.* at 12.)  These alterations occurred after Defendant removed employee access from the schedule on September 9, 2008, leaving only Schafer and other management with access.  (*Id.* at 11.)  Plaintiffs each identify one absence for which they called Schafer and requested time off which was not reflected on the schedules used by Smith in his evaluation of whether to terminate them. (*Id.* at 12.)  Plaintiffs also add that the identification badge access information is generally saved only for a six-week period.  (*Id.* at 13.)  They state that "anytime . . . they were not at work[,] they had approval from management." (*Id.*)

As Smith conducted his investigation in September of 2008, he prepared a detailed spreadsheet comparing the Airbus workgroup's schedule with other evidence that Plaintiffs had been at work, such as computer login activity, ID badge access to the facility, and shift notes. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 6.)  Plaintiffs dispute the reliability of the Airbus workgroup's schedule.  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 13.)  Based upon his research, Smith concluded that Plaintiff Reynolds had twenty days for which she was scheduled to work but had no computer activity, ID badge scans, or shift notes.  (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 6.)  Similarly, Plaintiff Harris had twenty-three days for which he was scheduled to work but had no computer activity, ID badge scans, or shift notes.  (*Id.*)

Plaintiffs dispute the implicit contention that they missed days of work without Schafer's prior approval. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 13-14.) They argue that, at a December 2007 meeting, Schafer told Matney, Allman, and the rest of the Airbus workgroup that they could work out scheduling issues and did not have to put their missed time on the schedule. (*Id.* at 14.) Plaintiffs relied on this statement in February of 2008 and took time off, but they made sure the desk was covered. (*Id.*) They also point out that, on October 16, 2008, Matney told Smith that the Airbus workgroup's schedule was constantly changing and unreliable. (*Id.* at 13.) This conversation took place before Smith made the decision to fire Plaintiffs. (*Id.*)

Following his investigation and consultations with Defendant's human resources and legal departments and his supervisor, Smith placed Plaintiffs on paid investigative suspension while he completed his investigation. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 6-7.) On October 8, 2008, Smith and another senior manager informed Plaintiffs individually of their suspension and offered them a chance to provide a statement. (*Id.* at 7.) In his deposition, Smith stated that he did not know of any prior complaint of discrimination by either Plaintiff when he decided to suspend Plaintiffs. (*Id.*) However, Plaintiffs point out that Smith knew about their complaints regarding discrimination during the October 8, 2008, meetings because Plaintiff Reynolds informed him of the "racially motivated stuff that was going on in the workgroup at that point." (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 14; Dep. of Reynolds, D.E. # 43-3, at 40.) On October 8, 2008, Smith had not yet made his decision to terminate Plaintiffs. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 14.)

In Smith's October 8, 2008, meeting with Plaintiff Harris, Plaintiff Harris admitted that he took four days off without documenting them on the February schedule, but he stated that

Matney had told him he could do so.  (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 7.)

However, Matney denied telling Plaintiff Harris that he could take undocumented time off.  (*Id.*)

Also in this meeting, Plaintiff Harris informed Smith that he would ride a motorcycle to work

and follow another car through the gate, thus explaining the lack of ID badge activity at the guard

gate.  (*Id.*)  Moreover, he stated that the door to enter the building had been broken for a period

of time, and employees could enter without swiping their ID badges.  (*Id.*)  Some days, he trained

with another employee and did not log into the computer.  (*Id.*)  Although Defendant states that

Plaintiff Harris could not explain how the days with no access card activity matched with the

dates of no computer activity and days with access card activity also had computer activity,

Plaintiffs provide an explanation.  They assert that the ID badge access report can only be

accessed for the previous six weeks, but Smith told Plaintiffs he had information for all of the

days they had missed.  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 15.)  Plaintiff Harris explained

that on days when too many people were working, he would not have access to the computer, and

at the end of the shift he would explain his lack of computer access on the shift notes report.

(*Id.*)

Smith also spoke with Plaintiff Reynolds on October 8, 2008, and confronted her with the

same evidence as Plaintiff Harris.  (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 8.)  She

admitted that she took four days off in February and March of 2008 without documenting them,

and she assumed it would be acceptable to do so because Schafer allowed two other employees to

take off undocumented days in December of 2007 after he had made them work holiday vacation

days they had planned to take off.  (*Id.*)  She called the veracity of the schedule into question and

requested to speak with human resources regarding the disagreement with her white coworkers

about the racial statements made in the workplace regarding Plaintiff Harris.  (*Id.*; Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 16.)

### Plaintiffs' Statements

Both Plaintiffs submitted statements to Smith as requested.  Plaintiff Harris' statement reiterated that Matney had given him permission to take a few days off.  (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 8.)  Additionally, Plaintiff Harris addressed the animosity he experienced from Nallick due to his crossing of a union picket line and his race.  (*Id.*)  Defendant acknowledges that Plaintiff Harris stated that he had complained to Schafer in June of 2008 about Nallick's comments, but it also points out that Schafer and Nallick deny that race was mentioned at the June 2008 meeting.  (*Id.* at n.2.)  Moreover, in September of 2008, while Smith was investigating the Letter, he was unaware of this June 2008 meeting and the topics discussed during it.  (*Id.*)  Plaintiffs dispute these facts because Nallick admitted calling Plaintiff Harris a scab in the meeting.  (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 17.)

The contents of Plaintiff Reynolds' statement are undisputed:

> . . . So [Allman] and [Matney] were allowed time off without being charged any hours with [Schafer]'s approval.  I was not given undocumented time off for the disruption to my plans.  This was common knowledge in the workgroup so when the Routers finally went to [eight] hour shifts in February 2008 (after being on exhausting [twelve] hour shifts for over a year) and there was ample coverage then some of us took a few days, just like [Schafer] had approved for [Allman] and [Matney] to do in November or December of 2007. . . . The perception was that this would not be a reason for punishment because [Schafer] had done so for others and it was not a problem for him to do this.

(Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 9.)  Plaintiff Reynolds also alleged that some tension existed between some members of the Airbus workgroup, and she had been subjected to unprofessional behavior in the workplace.  (*Id.*)

### Smith's Final Termination Decision

Smith conducted follow-up interviews with both Plaintiffs and several of their coworkers. (*Id.*) Allman, Mike Bunker ("Bunker"), Nallick, and David Vanpelt ("Vanpelt") reported that they thought that Plaintiffs took undocumented and unauthorized time off or that they were not at work when they were expected to be there. (*Id.*) During Smith's interviews, he interviewed Matney and Allman about taking time off in December of 2007, and they indicated that Schafer had given them permission to work out their holiday-related scheduling conflicts. (*Id.*) However, they did not indicate that Schafer's permission extended to other employees or other dates. (*Id.*)

Plaintiffs dispute that Smith's investigation garnered proof that Plaintiffs were taking undocumented and unapproved time off. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 18.) Plaintiffs cite to portions of the depositions of Vanpelt and Allman and argue that Smith should not have listened to Vanpelt and Allman's inconsistent and unbelievable statements. (*Id.*) Plaintiffs also dispute that Schafer did not give the rest of the Airbus workgroup permission not to document absences from work, as Matney indicated that the entire Airbus workgroup was present when Schafer made the announcement related to vacation time in December of 2007 and Plaintiff Reynolds stated that Schafer said that he would make the difference up to the other routers at a later time. (*Id.* at 19.)

On October 28, 2008, Smith made the decision to terminate Plaintiffs. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 10.) All parties agree that Plaintiffs were terminated as of this date. Plaintiffs filed suit one year later, on October 28, 2009. (*Id.*)

### Post-Termination Events

The parties do not dispute that Plaintiffs filed internal appeals of their terminations, and they made specific allegations of discrimination and retaliation. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 10.) As a result, Defendant's human resources department conducted an internal investigation involving interviews of Plaintiffs and other coworkers, but the investigation did not substantiate discrimination against Plaintiffs. (*Id.*) Therefore, upper management upheld their termination. (*Id.*) Plaintiffs dispute that the investigation did not substantiate Plaintiffs' claims of discrimination. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 19.) They assert that Shirley Lawrence ("Lawrence"), Defendant's human resources manager, admitted that discrepancies with the schedule would call into question the veracity of the dates used to terminate Plaintiffs. (*Id.*) She also stated that any use of an inaccurate schedule to terminate Plaintiffs would violate Defendant's fair treatment policy. (*Id.* at 20.)

Smith found no discrepancies in the various versions of the schedule he examined except for the two days in December of 2007 showing no computer activity for Matney when she was not scheduled to be off. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 10.) Jennifer Schmidt ("Schmidt"), Matney's supervisor, noted that Allman's schedule had changed in December of 2007 as well. (*Id.*) Both Matney and Allman had received permission from Schafer to work around scheduling conflicts, but both of them received internal counseling related to documentation of their days off. (*Id.* at 10-11.) Plaintiffs again dispute the reliability of the computer schedules, but they do not dispute that Matney and Allman, who received a non-disciplinary counseling, were treated differently than Plaintiffs. (Pls.' Resp. to Def.'s Facts, D.E. # 46-1, at 20.)

Defendant did not specifically hire individuals to fill the spots created by Plaintiffs' terminations. (Def.'s Statement of Undisputed Facts, D.E. # 43-2, at 11.) However, the department did hire a black employee and a white employee to fill two other positions, and those same employees were then transferred to the Airbus workgroup. (*Id.*) These individuals perform duties similar to the duties performed by Plaintiffs. (*Id.*)

### Anonymous Fax to Plaintiffs' Counsel

On August 2, 2011, Plaintiffs filed a Motion to Reopen Discovery under Rule 56(d), as they received an email via fax written by Matney which indicated that she had been requested "not to incriminate a FedEx manager" during her deposition. (D.E. # 58.) The Magistrate Judge reopened discovery for the limited purpose of exploring Matney's assertions that she had been told not to incriminate a FedEx manager. (D.E. # 66-67.) As part of their supplemental briefing, the parties submitted additional statements of fact related to this discovery. (D.E. # 68-69.)

Defendant does not dispute that Schmidt, Matney's supervisor, denied telling Matney not to incriminate a FedEx manager. (Def.'s Resp. to Pls.' Additional Facts, D.E. # 69, at 3.) According to Schmidt, Matney was allegedly afraid before her deposition and went to Schmidt for reassurance. (*Id.*) Schmidt told Matney to tell the truth. (*Id.*) Plaintiffs cite to the email submitted as Exhibit 55-3 to their Sur-Reply and assert that Matney believed her job was on the line if she incriminated a FedEx manager during her deposition.[6] (Pls.' Additional Facts, D.E. #

---

[6] Defendant objects to Plaintiffs' submission of inadmissible documents as attachments to their Sur-Reply. (D.E. # 57.) It argues that Plaintiffs submitted unsworn, unauthenticated documents which contain hearsay. (*Id.* at 2.) Exhibit 55-1 appears to be a partially blacked-out schedule, Exhibit 55-2 appears to be a write-up of Nallick for calling someone an inappropriate name, and Exhibit 55-3 is the email from Matney which precipitated the reopening of discovery. Because these documents are unauthenticated and contain hearsay, they do not meet the requirements of Rule 56, and Defendant's objections are well-taken.

68, at 2.)  Because Defendant disputes these assertions,[7] the Court turns to Matney's deposition.

At her deposition, Matney speculated that Maureen Patton ("Patton"), Schmidt's supervisor, could have told Schmidt to advise Matney not to incriminate a FedEx manager.  (Dep. of Matney, D.E. # 68-1, at 40.)  Matney stated that she told the truth in her initial deposition and that she did not perjure herself at all.  (*Id.* at 41.)  The conversation she had with Schmidt prior to her initial deposition did not affect her deposition testimony.  (*Id.*)  However, Matney maintained that Schmidt told her not to incriminate a FedEx manager.  (*Id.* at 43.)

In their Supplemental Response, Plaintiffs indicate that they intend to file a Motion for Sanctions after the Court rules on Defendant's Motion for Summary Judgment and seek a jury instruction informing the jury that Defendant had a duty to disclose Matney's email.  (D.E. # 68, at 5.)  As Plaintiffs have not yet filed a formal motion requesting this relief, the Court need not rule on this request at this time.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that the

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[8]

---

Therefore, Defendant's objections are **SUSTAINED**, and the Court will disregard these Exhibits and their contents.

[7]     Plaintiffs object to Defendant's filing of a Supplemental Reply to their Supplemental Response and request that it be stricken.  (Pls.' Supplemental Sur-Reply, D.E. # 72, at 5.)  However, in their Supplemental Response, Plaintiffs submitted additional statements of fact and legal argument to which Defendant was entitled to respond without the Court's permission.  *See* Local Rule 56.1(c).  Therefore, Plaintiffs' objection is **OVERRULED**, and the Court will not strike Defendant's Supplemental Reply.

[8]     Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[9]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but instead must present some "specific facts showing that there is a genuine issue for trial."[10]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[11]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[12]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[13]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[14]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[15]

---

[9]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[10]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[11]     *Matsushita*, 475 U.S. at 586.

[12]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[13]     *Id*. at 251-52.

[14]     *Celotex*, 477 U.S. at 322.

[15]     *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

<u>**ANALYSIS**</u>

<u>**42 U.S.C. § 1981**</u>

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."[16] These rights are also protected "against impairment by nongovernmental discrimination and impairment under color of State law."[17]  Section 1981 is "generally invoked in the employment context for . . . claims of hostile [work] environment, failure to promote, or wrongful dismissal;" other common situations involving § 1981 litigation include claims of discrimination in retail and service settings.[18]

Generally, a contractual limitations period must be reasonable to restrict a statutory limitations period.[19]  Neither a six- or eight- month contractual limitations period is unreasonable as long as a plaintiff has an adequate opportunity to investigate his or her claims and prepare for a controversy.[20]  Furthermore, the Supreme Court has noted that "the pendency of a grievance, or

---

[16]  42 U.S.C. § 1981(a).

[17]  *Id.* § 1981(c).

[18]  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

[19]  *Myers v. W-S Life Ins. Co.*, 849 F.2d 259, 262 (6th Cir. 1988).

[20]  *Id.* (finding a six-month contractual statute of limitations reasonable); *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1005 (6th Cir. 2009) (same); *Badgett v. Fed. Express Corp.*, 378 F. Supp. 2d 613, 626 (M.D.N.C. 2005) (finding a similar FedEx statute of

some other method of collateral review of an employment decision, does not toll the running of the limitations period. . . . The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made."[21]  And the Sixth Circuit has recognized that "the critical date [for statute of limitations purposes, contractual or otherwise,] is the date of termination; the existence of a grievance procedure does not change the importance of this date."[22]

Tennessee law defines an adhesion contract as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain, and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract."[23]  The essence of adhesion is that the parties' bargaining positions and leverage enable one party to "select and control risks assumed under the contract."[24]

However, just because a contract is adhesive does not mean it is unenforceable.  Indeed, "[e]nforceability generally depends upon whether the terms of the contract are beyond the

---

limitations reasonable).  Furthermore, if a six-month contractual limitations period is reasonable, a longer eight-month period in the same context would also be reasonable.  *See Myers*, 849 F.2d at 262; *Mazera*, 565 F.3d at 1005; *Badgett*, 378 F. Supp. 2d at 626.

[21]     *Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980).

[22]     *Kessler v. Bd. of Regents*, 738 F.2d 751, 754 (6th Cir. 1984).

[23]     *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 499 (6th Cir. 2004) (quoting *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996)).

[24]     *Cooper*, 367 F.3d at 499-500 (quotation omitted).  The parties assume that Tennessee law applies to the Employment Agreements; therefore, the Court will apply Tennessee law to interpret them.

reasonable expectations of an ordinary person, or oppressive, or unconscionable."[25] Unenforceable adhesion contracts limit the obligations and liability of the stronger party, oppress the weaker party, or eliminate a meaningful choice for the party occupying the weaker bargaining position.[26]  An absence of meaningful choice exists for the weaker party if he or she would be unable to find suitable employment if he or she refused to sign the employer's agreement; notably, "[g]eneralizations about employer practices in the modern economy cannot substitute for such evidence."[27]

Judicial notice of adjudicative facts is appropriate when the facts would not be subject to reasonable dispute.[28]  The Federal Rules of Evidence identify two areas of judicially noticeable adjudicative facts: those "generally known within the territorial jurisdiction of the trial court" or those "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[29]  While a court generally has the discretion to take judicial notice of these facts, it is required to take judicial notice only if requested by a party and supplied with the necessary information.[30]

---

[25]     *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 976-77 (6th Cir. 2007); *Buraczynski*, 919 S.W.2d at 320.

[26]     *Seawright*, 507 F.3d at 976; *Buraczynski*, 919 S.W.2d at 320.

[27]     *Cooper*, 367 F.3d at 502.

[28]     Fed. R. Evid. 201(a)-(b).

[29]     *Id.* 201(b).

[30]     *Id.* 201(c)-(d).

Here, Defendant does not challenge the merits of Plaintiffs' § 1981 claim. Rather, its arguments center upon the statute of limitations contained in Plaintiffs' Employment Agreements. In its Motion, Defendant argues that Plaintiffs' § 1981 claims are time-barred because their Employment Agreements required them to bring suit within six months of the event forming the basis of their lawsuit.[31] Because Defendant terminated Plaintiffs on October 28, 2008, and they did not file suit until October 28, 2009, Defendant contends that their § 1981 claims are time-barred. Furthermore, Defendant states that their pursuit of its internal appeal process does not excuse their failure to comply with the contractual statute of limitations.[32]

In response, Plaintiffs request the Court to take judicial notice of the fact that Plaintiffs were required to sign the Employment Agreement for Defendant to hire them.[33] Plaintiffs then classify the Employment Agreement as an unenforceable adhesion contract offered on a take-it-or-leave-it basis.[34] They assert that the Employment Agreement is "oppressive [and] obviously written by . . . Defendant to limit its liability or obligations" and that Defendant failed to remind Plaintiffs that the Employment Agreement contained a statute of limitations causing their claims to expire six months after their termination.[35]

---

[31]    (Def.'s Mot., D.E. # 43-1, at 13.)

[32]    (*Id.*)

[33]    (Pls.' Resp., D.E. # 76, at 3-4.)

[34]    (*Id.* at 4-5.)

[35]    (*Id.* at 5.)

In reply, Defendant argues that Plaintiffs have failed to meet their burden to establish that the Employment Agreements are unenforceable adhesion contracts.[36] Defendant points to Plaintiffs' judicial notice request and asserts that Plaintiffs have not cited to record evidence to support their assertion that the Employment Agreements were offered on a take-it-or-leave-it basis without the opportunity to bargain.[37] Defendant argues that judicial notice of this fact would be inappropriate.[38] Furthermore, Defendant submits that even if the Court were to find that the Employment Agreement was an adhesion contract, Plaintiffs have not submitted evidence that they would be unable to find suitable employment if they had refused to agree to the contractual statute of limitations.[39] Additionally, Defendant states that the six-month statute of limitations is not unconscionable.[40]

In their Sur-Reply, Plaintiffs reassert their judicial notice argument, stating that "[t]he fact that the employment agreement is taken on a take-it-or-leave-it basis is just the type of evidence that may be judicially noticed by a court."[41] They point out that they did not assert that the six-month statute of limitations is unconscionable, but they argue that "reasonable jurors could find that Defendant buried the terms of the six- or eight-month limitations period at the bottom of the

_____

[36]     (Def.'s Reply, D.E. # 50, at 2.)

[37]     (*Id.*)

[38]     (*Id.*)

[39]     (*Id.* at 3.)

[40]     (*Id.* at 5-7.)

[41]     (Pls.' Sur-Reply, D.E. # 55, at 2.)

contract to oppress its employees' rights to bring suit and to give it an advantage in litigation."[42]

For the first time, and without citing to record evidence, Plaintiffs assert that Defendant failed to

give them a copy of the Employment Agreement and failed to inform them of the six-month

limitation period.[43]  Accordingly, Plaintiffs request the Court to find that the Employment

Agreements are unenforceable adhesion contracts.

At the outset, the Court finds that the contractual limitations period in the Employment

Agreements is reasonable.  Plaintiff Harris' six month contractual limitations period is also

reasonable, especially as other courts have found the same time period in similar contracts to be

reasonable.[44]  Although a dispute exists as to whether the statute of limitations in Plaintiff

Reynolds' Employment Agreement is six or eight months, the Court finds the distinction to be

one of little difference.  Even if it was eight months, Plaintiff Reynolds would still have had an

adequate opportunity to investigate her claims and prepare for a controversy, and she would have

had two months longer than Plaintiff Harris.  Therefore, her contractual limitations period, be it

six or eight months, is reasonable as well.

However, the Court declines to take judicial notice as requested by Plaintiffs.  The fact

that, as Plaintiffs allege, Defendant would not have hired Plaintiffs had they refused to sign the

Employment Agreements and that the Employment Agreements were offered on a take-it-or-

leave-it basis, is not an adjudicative fact for which judicial notice would be appropriate.  The

---

[42]     (*Id.* at 3.)

[43]     (*Id.* at 3-4.)

[44]     *See Ray v. FedEx Corp. Servs.*, 668 F. Supp. 2d 1063 (W.D. Tenn. 2009);
*Badgett*, 378 F. Supp. 2d at 613.

Court will not go so far as to take judicial notice of the facts which would permit Plaintiffs to survive summary judgment on their § 1981 claims, and Plaintiffs have not set forth a sufficient legal or factual basis to permit the Court to take judicial notice as required by the Federal Rules of Evidence. Therefore, Plaintiffs have failed to present evidence on the third element of Tennessee's definition of an adhesion contract.

Nevertheless, the Court notes that the Employment Agreements' structure smacks of oppression and, quite frankly, would not pass the smell test. The limitations period is not bolded or highlighted in any way, nor does it have a separate heading. It is not readily obvious to the naked eye, nor is it in all capital letters. Furthermore, Defendant was in a higher bargaining position than its potential employees when it presented the Employment Agreements for their signature.

But in the face of Plaintiffs' failure to set forth facts sufficient to satisfy the third element of the definition of a contract of adhesion, the Court finds that the Employment Agreements are not adhesion contracts, and the six- or eight-month contractual limitations period contained in them is enforceable. Accordingly, because they were discharged on October 28, 2008, and did not file suit until October 29, 2009, Plaintiffs filed suit outside the contractual limitations period regardless of whether their Employment Agreement contained a six-month or an eight-month limitations period. Thus, their § 1981 claims are time-barred, and Defendant's Motion for Summary Judgment in this regard is **GRANTED**.

## Hostile Work Environment

Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."[45] It also protects employees from workplaces "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[46] To prevail on a hostile work environment claim, a plaintiff must show that his or her work environment was both objectively and subjectively hostile.[47] Thus, a prima facie case of a hostile work environment based on race consists of five elements: (1) membership in a protected class; (2) subjection to unwelcome harassment; (3) race-based harassment; (4) unreasonable interference with work performance by creating an intimidating, hostile, or offensive work environment, and (5) employer liability.[48]

An alleged hostile work environment is evaluated by examining the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[49] Notably, single episodes of racially derogatory language are insufficient to establish that the comments are severe or pervasive.[50]

---

[45] 42 U.S.C. § 2000e-2(a)(1).

[46] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[47] *Ejikeme v. Violet*, 307 F. App'x 944, 948 (6th Cir. 2009).

[48] *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

[49] *Harris*, 510 U.S. at 23.

[50] *Cooper v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 956 (W.D. Tenn. 2010).

And a hostile work environment plaintiff needs to allege sufficient specificity as to the time, place, and context of alleged discriminatory statements to create a genuine issue of material fact.[51]

Employer liability for the actions of a plaintiff's coworker exists when "the employer knew or should have known of the alleged conduct and failed to take prompt remedial action such that the employer tolerated or condoned the situation."[52] However, the Supreme Court has recognized an affirmative defense to employer liability if the defendant has taken no tangible employment action.[53] Tangible employment actions include "discharge, demotion, or undesirable reassignment."[54]

To assess whether a court may, for the purposes of determining liability, review certain instances of conduct, Title VII provides that an EEOC charge must be filed within 180 or 300 days "after the alleged unlawful employment practice occurred."[55] Hostile work environment

---

[51]     *Id.* (citing *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009); *Fuelling v. New Vision Med. Labs. LLC*, 284 F. App'x 247, 259-60 (6th Cir. 2008); *Fasone v. Clinton Twp.*, No. 97-3267, 1998 WL 165147, at *1 (6th Cir. Apr. 3, 1998); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996)).

[52]     *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988).

[53]     *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). The defense consists of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

[54]     *Id.* at 808.

[55]     42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 116-17 (2002). Neither part disputes that the relevant time period in this case is 300 days.

claims are continuing in nature, and as such, they are composed of a series of separate acts which collectively constitute one "unlawful employment practice."[56]  Indeed,

> [t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[57]

In addition to Title VII's jurisdictional requirement of filing a Charge of Discrimination with the EEOC, a party's discrimination claim in district court is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."[58]  Generally, a Title VII plaintiff cannot bring claims that were not included in his EEOC charge.[59]  An "EEOC complaint should be liberally construed to encompass all claims reasonably expected to grow out of the charge of discrimination."[60]  This test asks whether facts were established in the charge of discrimination which would prompt the EEOC to investigate a different, uncharged claim.[61]

In their Response, Plaintiffs present arguments related to, but do not move for summary judgment on, Plaintiff Harris' hostile work environment claim.[62]  They lay out eight events of

---

[56]     *Morgan*, 536 U.S. at 117.

[57]     *Id.*

[58]     *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).

[59]     *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).

[60]     *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 731 (6th Cir. 2004).

[61]     *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 471 (6th Cir. 2008).

[62]     Plaintiffs note that a "hostile work environment existed for Plaintiff Harris," but they do not argue that Plaintiff Reynolds was subjected to the same hostile work environment.

harassment and argue that those events, when viewed in the totality of the circumstances, were "sufficiently severe and pervasive enough to create an actionable racial harassment claim."[63] Additionally, they argue that Defendant cannot rely on an affirmative defense to escape liability for the hostile work environment because Schafer took no action after Plaintiff Harris complained to him about the alleged discrimination. Furthermore, according to Plaintiffs, Defendant would not be eligible for an affirmative defense because Plaintiff Harris suffered a tangible employment action: he was terminated.[64]

In reply, Defendant argues that Plaintiff Harris' hostile work environment claim should be dismissed for several reasons. First, it states that Plaintiff Harris did not plead a separate claim of "hostile work environment" as a cause of action in his Complaint.[65] Even if he did, it would be barred for failure to exhaust administrative remedies, as he did not include it in the charge of discrimination he filed with the EEOC.[66] Third, even if Plaintiff Harris' EEOC charge could be interpreted to include a hostile work environment claim, Defendant argues that the conduct was not severe or pervasive enough to support a hostile work environment claim, as Plaintiff Harris identified only two instances of derogatory comments in the 300 days preceding

---

(Pls.' Resp., D.E. # 76, at 25-27.) Therefore, the Court finds that Plaintiffs attempt to bring a hostile work environment claim on behalf of Plaintiff Harris only.

[63]     (*Id.* at 27.)

[64]     (*Id.*)

[65]     (Def.'s Reply, D.E. # 50, at 16.)

[66]     (*Id.* at 17.)

the filing of his EEOC charge.[67]  Fourth, even if Plaintiff Harris can show that these two

statements are either severe or pervasive, he cannot show that they were made because of his

race.[68]  Finally, Defendant contends that if Plaintiff Harris can make out a hostile work

environment claim, Defendant took reasonable care to prevent and correct any harassing behavior

and Plaintiff unreasonably failed to take advantage Defendant's preventive or corrective

opportunities.[69]

       In Plaintiffs' Sur-Reply, Plaintiff Harris notes that a hostile work environment is a form

of disparate treatment under Title VII, and he adequately pled disparate treatment in the

Complaint.[70]  Next, Plaintiff Harris argues that the factual basis in his EEOC charge supports a

hostile work environment claim, and if the Court liberally construes his EEOC charge, he would

have properly exhausted his administrative remedies.[71]  Third, Plaintiff Harris submits that

because Nallick made at least one racist comment in the 300 days preceding his filing of the

EEOC charge, all of the discriminatory acts directed at Plaintiff Harris can be used to support

Defendant's hostile work environment liability.[72]  Finally, Plaintiff Harris states that Defendant

cannot rely on the *Faragher* affirmative defenses because Plaintiff Harris suffered a tangible

---

[67]      (*Id.* at 17-18.)

[68]      (*Id.* at 18.)

[69]      (*Id.* at 18-19.)

[70]      (Pls.' Sur-Reply, D.E. # 55, at 12.)

[71]      (*Id.* at 13.)

[72]      (*Id.* at 14.)

employment action.[73]

For the sake of argument, the Court will assume that the Complaint contains a colorable hostile work environment claim because Plaintiff pled damages arising out of disparate treatment under Title VII. Additionally, although it is a close call, the Court finds that a hostile work environment claim could reasonably arise from Plaintiff Harris' EEOC charge. Although he did not check the box for "Other," did not check the "Continuing Action" box, and only indicated that the discrimination took place between October 8, 2008, and October 28, 2008, the factual basis for his EEOC charge saves any hostile work environment claim Plaintiff Harris may have stated in his Complaint.[74] In the investigation of his allegations of racist comments made by a coworker, the EEOC's investigation could reasonably have expanded to include an investigation into other comments made by other coworkers or Defendant's management. Therefore, the Court will assume that Plaintiff Harris' EEOC charge can be interpreted to include a hostile work environment claim.

Moreover, if Plaintiff Harris' EEOC charge includes a hostile work environment claim, such a claim would be timely. Under Sixth Circuit precedent, Plaintiff Harris needed to articulate an event comprising part of the ongoing hostile work environment in his EEOC notice within 300 days of his termination for his claim to be timely.[75] Thus, Plaintiff Harris had to identify one discriminatory remark forming part of the hostile work environment which occurred on or after June 6, 2008. He noted that Nallick uttered a discriminatory comment in June of

---

[73]     (*Id.* at 15.)

[74]     (EEOC Charge of Discrimination, D.E. # 50-1, at 21.)

[75]     Plaintiff Harris filed his EEOC charge on April 2, 2009. (D.E. # 50-1, at 21.)

2008. While this comment could have occurred before June 6, 2008, thereby rendering Plaintiff

Harris' hostile work environment claim untimely, the Court will assume that the remark occurred

after the June 6, 2008 cut-off.

Accordingly, the Court turns to Plaintiff Harris' prima facie case. It is undisputed that

Plaintiff Harris is a member of a protected class. Additionally, Nallick's statements to Plaintiff

Harris were unwelcome, as Schafer held a meeting at Plaintiff Harris' request with Plaintiff

Harris and Nallick regarding the statements. The remaining three elements of the prima facie

case are disputed.[76] But any potential hostile work environment claim ultimately found to be

raised by Plaintiff Harris fails because the harassment he suffered was not objectively severe or

pervasive.

Plaintiff Harris did not allege that another individual made racist comments regarding

him or his work; the only individual he identified was Nallick. Although he alleges that Allman

and a group of others nodded in agreement with Nallick's statements one time, that agreement is

insufficient to raise any harassment to the severe or pervasive level. Also, Plaintiff Harris noted

that the harassment had been going on for a six- to eight-month period and that Nallick's

comments were frequent, but the lack of detail in his assertions does not objectively demonstrate

that the harassment was severe or pervasive. While he noted that Nallick made discriminatory

comments ten or more times before May of 2008, Plaintiff Harris did not give specific dates of

comments, nor did he identify which statements Nallick uttered on which days.

Additionally, while Nallick's "you people" comments could be racially tinged as

---

[76]    The Court notes that Defendant's asserted affirmative defense would not apply
because Defendant took a tangible employment action by terminating Plaintiff Harris.

discussed below, and his use of the phrase "scab n---er" certainly was, Nallick's other comments regarding Plaintiff Harris' status as a "scab" are discriminatorily ambiguous. In light of this ambiguity and lack of detail, the Court finds that the statements appear to be mere offensive utterances not rising to the level necessary to alter Plaintiff Harris' work environment. Therefore, Plaintiff Harris has failed to set forth a prima facie case of a hostile work environment claim, and any hostile work environment claim arising out of his Complaint and EEOC charge would fail. Accordingly, Defendant's Motion for Summary Judgment in this regard is **GRANTED**.

<u>**Race Discrimination**</u>

Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."[77] Plaintiffs may establish discrimination in one of two ways: through the use of direct evidence or through circumstantial evidence using the burden-shifting framework articulated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).[78] Any evidence which requires an inference to be drawn to determine the motivation behind it is not direct evidence of discriminatory animus.[79] Direct evidence establishes "not only that the plaintiff's employer was predisposed to discriminate on the basis of [race] but also that the employer acted on that predisposition."[80] Additionally, the cat's paw theory of liability, discussed more thoroughly

---

[77]    42 U.S.C. § 2000e-2(a)(1).

[78]    *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 835 (6th Cir. 2012).

[79]    *See id.* at 836.

[80]    *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).

33

below, applies to cases of both direct and circumstantial evidence.[81] To determine whether statements are relevant as direct evidence of discrimination or are merely stray remarks, courts consider: "(1) whether the remarks were made by the decisionmaker or by an agent uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time to the challenged decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias."[82]

Under *McDonnell Douglas*, a prima facie case consists of four elements: (1) membership in a protected class; (2) that the plaintiff was qualified for the job; (3) that he or she suffered an adverse employment action; and (4) that he or she was treated differently than similarly situated employees of a different race.[83] To be considered similarly situated, the comparator's employment situation must be similar to that of the plaintiff in all relevant aspects.[84] Additionally, when a majority plaintiff is involved, the first prong of the prima facie case is modified to require a showing of "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."[85] Background circumstances may be shown using evidence of a defendant's unlawful consideration of race as a factor in hiring in the past, which "justifies a suspicion that incidents of capricious discrimination

---

[81]     *Id.* at 837.

[82]     *Worthy v. Mich. Bell Tel. Co.*, No. 10-2441, 2012 WL 934029, at *5 (6th Cir. Mar. 21, 2012).

[83]     *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).

[84]     *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011).

[85]     *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002).

against whites because of their race may be likely."[86]

Additionally, cases which accept "mere temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"[87] When making this statement, the Supreme Court cited cases in which three- and fourth-month periods between the employer's knowledge of the protected activity and the adverse employment action were insufficient.[88] Therefore, when some time passes between the protected activity and the adverse employment action, plaintiffs are required to "couple temporal proximity with other evidence of retaliatory conduct to establish causality."[89]

If a plaintiff can establish these four elements of the prima facie case of discrimination, "the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for the adverse action."[90] If the defendant meets that burden of production, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was merely a pretext for discrimination.[91] There are three bases for a defendant's reason to be pretextual: (1) it has "no basis in fact," (2) it "did not actually motivate the adverse action," or (3) it "was

---

[86] *Id.* at 256.

[87] *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).

[88] *Id.* at 273-74.

[89] *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

[90] *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 202 (6th Cir. 2004).

[91] *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)).

insufficient to motivate the adverse action."[92]  Where the employer took the adverse employment action in the honest belief of information provided by a third party, the plaintiff cannot win by showing that the information was mistaken or incorrect.[93]  In that instance, the plaintiff must show that the employer's reliance on that outside information was unreasonable.[94]  If the plaintiff can show that the defendant's "proffered, nondiscriminatory reason was pretextual, unlawful retaliation may be inferred and she would be entitled to take her claim to a jury."[95]  Throughout this entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion.[96]

## Cat's Paw Liability

The Supreme Court has defined cat's paw liability as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable under [Title VII]."[97]  *Staub* relied on principles of agency and tort law to impute a lower-level supervisor's discriminatory animus to an otherwise unbiased

---

[92]    *Id.*

[93]    *Denhof v. City of Grand Rapids*, 494 F.3d 534, 542 (6th Cir. 2007).

[94]    *Id.* at 542-43.

[95]    *Id.*  (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 344 (6th Cir. 1997)).

[96]    *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

[97]    *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (emphasis in original). Although *Staub* dealt with anti-military discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), the Supreme Court noted that "[USERRA] is very similar to Title VII."  *Id.* at 1191.  Additionally, the district court decisions citing to *Staub* apply it in both the USERRA and Title VII contexts.  *See, e.g.*, *EEOC v. Decker Transp. Co., Inc.*, No. 09-13116, 2011 WL 1792763, at *5 (E.D. Mich. May 11, 2011). Therefore, the Court finds that its reliance on *Staub* in this Title VII case is proper.

decision-maker, thereby rendering the employer liable for the non-decisionmaker's discrimination.[98]   Additionally, if the decisionmaker undertakes an investigation which results in an adverse action for reasons unrelated to the supervisor's original biased action, the employer will not be liable.[99]   However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."[100]   Thus, the Supreme Court refused to completely absolve employers for conducting an independent investigation: "[it was] aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect."[101]   Notably, the Supreme Court "express[ed] no view as to whether the employer would be liable if a coworker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision."[102]

Since *Staub* issued, the Sixth Circuit has cited it twice.  The first case, *Bobo v. United Postal Serv., Inc.*, 665 F.3d 741 (6th Cir. 2012), defined cat's paw liability as "a situation in which 'a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to make an adverse employment decision, thereby hiding the subordinate's

---

[98]      *Staub*, 131 S. Ct. at 1191-92.

[99]      *Id.* at 1193.

[100]      *Id.*

[101]      *Id.*

[102]      *Id.* at 1194 n.4.

discriminatory intent.'"[103] *Bobo* interpreted *Staub* as applying cat's paw liability to a direct supervisor's discriminatorily-motivated act which proximately caused the adverse employment action.[104] The second case, *Romans*, cited *Staub* as part of the plaintiff's direct evidence claim and explained that the plaintiff had not provided direct evidence of the non-decisionmaker supervisor's discriminatory animus, thereby failing to undercut its effect on the decisionmaker's independent investigation.[105]

Several district courts have cited *Staub* as well. One noted that *"Staub* is only a minor variation of the existing rule in this Circuit . . . that an employer may be held liable for discrimination if the impermissible bias of one supervisor influenced the decision of an other-wise non-biased decision-maker."[106] The original rule, discussed in *Arendale*, stated that "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, the [Sixth Circuit] has held that the employer may be held liable under a . . . 'cat's paw' theory of liability."[107] Another district court noted that *Staub* contains a three-part test: for an employer to be liable for a non-decisionmaking supervisor's discriminatory conduct, the supervisor must "(1)

---

[103] *Bobo*, 665 F.3d at 755 (internal punctuation omitted) (quoting *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009)).

[104] *Id.* (citing *Staub*, 131 S. Ct. at 1194).

[105] *Romans*, 668 F.3d at 836-37.

[106] *EEOC v. CSX Transp., Inc.*, No. 10-cv-667, 2012 WL 84126, at *5 (S.D. Ohio Jan. 11, 2012) (noting that "[n]othing in *Staub* supports the rule suggested by [the defendant]—that an unbiased recommendation renders the entire decision-making process non-discriminatory").

[107] *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008).

perform an act motivated by discriminatory animus; (2) which is *intended* to cause an adverse

employment action; and (3) the act is a proximate cause of the ultimate employment action."[108]

No district court or Sixth Circuit panel has extended employer liability under a cat's paw theory

to the statements of a biased, non-decisionmaking coworker.[109]

Plaintiffs argue that Allman and Nallick sent the Letter to human resources "for

discriminatory purposes and with the specific intent to cause the termination of Plaintiffs Harris

and Reynolds."[110]  Smith's termination of Plaintiffs had the same basis as the allegations of

undocumented time off raised in the Letter, and Smith's "blind reliance" on the Airbus

workgroup's schedule, to which Allman and Nallick had access, resulted in Smith's decision

being tainted by their racial animus.[111]  Plaintiffs downplay Defendant's reliance on Smith's

independent investigation: they assert that because his investigation relied in part on an

inaccurate schedule, it was not independent, and the taint of discrimination from Allman and

Nallick did not dissipate.[112]  Defendant argues that the cat's paw theory of liability does not

extend to a non-supervisory coworker's racial animus; thus, Title VII would not impose liability

---

[108]     *Naboychik v. Salix Pharm., Inc.*, No. 10-10521, 2011 WL 4485243, at *8 (E.D.
Mich. Sept. 27, 2011).

[109]     *See Kurth v. City of Inkster*, No. 10-11973, 2011 WL 6371085 (E.D. Mich. Dec.
20, 2011); *Johnson v. Miles*, No. 2009-189 (WOB), 2011 WL 3880507 (E.D. Ky. Sept. 2, 2011);
*Rogers v. Par Elec. Contractors, Inc.*, No. 10-cv-1402, 2011 WL 3862089 (N.D. Ohio Sept. 1,
2011); *Grant v. Walgreen Co.*, No. 10-11392, 2011 WL 2079923 (E.D. Mich. May 25, 2011);
*EEOC v. Decker Transp. Co., Inc.*, No. 09-13116, 2011 WL 1792763 (E.D. Mich. May 11,
2011).

[110]     (Pls.' Resp., D.E. # 76,  at 21.)

[111]     (*Id.*)

[112]     (*Id.* at 22.)

on Defendant for the actions of Plaintiffs' coworkers, Allman and Nallick.[113]

In their Sur-Reply, Plaintiffs point out that in *Staub*, the Supreme Court expressed no view as to whether an employer would be liable if a coworker, rather than a supervisor, committed a discretionary act that influenced the ultimate employment decision.[114] Plaintiffs direct the Court's attention to "coworker harassment cases" and note that "the standard for determining employer liability [in that context] is 'markedly different' from that applicable to supervisors" because employers are liable for their own acts or omissions.[115]

Both parties provided supplemental briefing on the issue of cat's paw liability to the Court. Defendant draws the Court's attention to four recently decided opinions from the Fifth and Eleventh Circuits, the Eastern District of New York, and the Southern District of Texas.[116] Defendant asserts that these cases stand for two propositions: first, that non-supervisory individuals motived by discriminatory animus cannot subject an employer to liability under a cat's paw theory of liability and second, that the acts committed by a supervisor who displays discriminatory animus must be the but-for cause of an employer's adverse employment decision under cat's paw liability.[117] In response, Plaintiffs point to case law from the Sixth and Seventh Circuits to imply that cat's paw liability extends to situations in which a coworker influences an

---

[113]    (Def.'s Reply, D.E. # 50, at 10-11.)

[114]    (Pls.' Sur-Reply, D.E. # 55, at 5.)

[115]    (*Id.*)

[116]    (Def.'s Supplemental Br., D.E. # 73, at 1-2.)

[117]    (*Id.*)

unbiased decisionmaker to make an adverse employment decision.[118]  Plaintiffs cite to *Bobo* as binding authority which requires the Court to find that cat's paw liability encompasses "a situation in which 'a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker.'"[119]

The Court finds that the cat's paw theory of liability is inapplicable to the case at bar. Although the Supreme Court left open the question of whether to extend cat's paw liability to coworkers' biased statements or actions, the Court finds it inappropriate to step beyond the bounds of delineated authority at this time.  Moreover, neither the Sixth Circuit nor any of the district courts in this Circuit which have examined *Staub* have extended its holding beyond non-decisionmaking supervisors.  Additionally, the Court is unpersuaded by Plaintiffs' reliance on *Bobo* for the proposition that "a biased subordinate" equates to "a biased coworker."  The cited sentence merely reiterates the definition of cat's paw liability: a biased subordinate—a biased supervisor—who lacks decisionmaking power influences the unbiased decisionmaker—the unbiased supervisor with greater authority.  *Bobo* does not set forth a definition of cat's paw liability contrary to that enunciated in *Staub*.

Therefore, the Court finds that Nallick's comments are insufficient to trigger a theory of cat's paw liability.  Nallick was Plaintiffs' coworker, not their supervisor.  As such, even though he had no decisionmaking authority, Nallick would not fit within the Supreme Court's definition of cat's paw liability because he was Plaintiffs' coworker, and his comments do not impute discriminatory intent to Smith.  Nor does Schafer trigger cat's paw liability: although he was

---

[118]    (Pls.' Supplemental Br., D.E. # 74, at 1-2.)

[119]    (*Id.* at 2 (citing *Bobo*, 665 F.3d at 755).)

Plaintiffs' supervisor without decision-making authority as required by the cat's paw theory, he did not make any discriminatory statements. His acquiescence in the face of allegations of Nallick's racism at the June 2008 meeting are insufficient to trigger cat's paw liability. Moreover, Plaintiffs have not set forth evidence indicating that Schafer made discriminatory statements about Plaintiffs. Accordingly, the Court finds that Plaintiffs are precluded from pursuing a theory of cat's paw liability in this case. They must rely on the traditional Title VII framework. Therefore, the Court turns to Plaintiffs' arguments in that regard.

### The Parties' Arguments

In its Motion, Defendant argues that Plaintiffs have no direct evidence of discrimination, as Smith did not use any racially discriminatory language and he made the decision to terminate Plaintiffs.[120] As for Plaintiffs' circumstantial evidence claim, Defendant argues that Plaintiffs cannot establish the fourth element of a prima facie case: it submits that Plaintiffs cannot show that similarly situated employees were treated differently, nor can they show that they were replaced by a non-protected individual.[121] Defendant submits that Allman and Matney's mitigating circumstances prevent them being similarly situated to Plaintiffs: it states that they took fewer undocumented days off and did so with permission, which renders them too dissimilar.[122] Furthermore, Defendant states that it hired two individuals, but those individuals are not outside Plaintiffs' protected class; therefore, Defendant avers that Plaintiffs cannot meet

---

[120]    (Def.'s Mot., D.E. # 43-1, at 15.)

[121]    (*Id.*)

[122]    (*Id.* at 17.)

the fourth element of their prima facie case.[123]

Moreover, Defendant submits that it has presented a legitimate nondiscriminatory reason for its termination of Plaintiffs because Smith reasonably concluded that Plaintiffs had taken undocumented time off work.[124] It then states that Plaintiffs cannot demonstrate pretext by calling into question the accuracy or correctness of Smith's conclusion or that Smith was merely a "cat's paw" for someone else with a discriminatory motive.[125] Defendant rests on Smith's independent investigation and asserts that his research sterilized the termination from the taint of Nallick's racial animus.[126]

In response, Plaintiffs argue that Nallick's statements constitute direct evidence of race discrimination which were reflected in the Letter and different versions of the schedule, which Smith relied on in his decision to terminate Plaintiffs.[127] Furthermore, Plaintiffs argue that even if Nallick's comments do not constitute direct evidence of discrimination, they can establish a prima facie case of discrimination by circumstantial evidence.[128] Plaintiffs argue that Allman and Matney are similarly situated to Plaintiffs because they worked in the same Airbus workgroup as Plaintiffs, had the same manager, and were given the same instructions from Schafer as to taking

---

[123]     (*Id.*)

[124]     (*Id.* at 19-20.)

[125]     (*Id.* at 20.)

[126]     (*Id.*)

[127]     (Pls.' Resp., D.E. # 76, at 10.)

[128]     (*Id.* at 11.)

undocumented time off.[129]

Plaintiffs also argue that Defendant's nondiscriminatory reason is not legitimate, as Smith relied on an unreliable schedule in his decision to terminate Plaintiffs.[130] Furthermore, they argue that they can prove pretext because Defendant's legitimate nondiscriminatory reason has no basis in fact.[131] Additionally, they argue that Defendant's reasoning is "not worthy of belief" and that no other Airbus workgroup employees were terminated for discrepancies related to the workgroup's schedules. They imply that questions of fact exist as to whether Allman lied about changing the schedule, Nallick's involvement in the Letter, and the events discussed at the June 2008 meeting.[132]

In reply, Defendant argues that Nallick's racial comments are stray remarks not constituting either direct or circumstantial evidence of racial animus.[133] Defendant submits that there is no nexus between Nallick's statements and Smith's decision to terminate Plaintiffs' employment because Nallick was not involved in the decisionmaking process.[134] Moreover, Defendant states that Nallick's remarks are too temporally remote from Plaintiffs' termination to constitute discrimination, as Nallick made the statements four months before Plaintiffs were

---

[129]    (*Id.* at 12.)

[130]    (*Id.* at 23.)

[131]    (*Id.*)

[132]    (*Id.* at 24-25.)

[133]    (Def.'s Reply, D.E. # 50, at 7.)

[134]    (*Id.* at 8-9.)

fired.[135]  Furthermore, Defendant asserts that "the insurmountable flaw in Plaintiffs' argument is that they only allege that Nallick exhibited discriminatory animus, but do not allege that Allman . . . exhibited any discriminatory racial animus."[136]  They point out that Plaintiffs' argument "hinges on the following allegation: '[p]rior to sending the [Letter], Allman discussed the letter with . . . Nallick, gave . . . Nallick a copy, and [Nallick] thanked him.'"[137]  Therefore, Defendant argues that "it is immaterial whether . . . Nallick harbored any discriminatory racial animus toward Plaintiffs because it is undisputed that he played no role in initiating the investigation that led to [Plaintiffs'] termination."[138]

Defendant also states that "[t]he fact that Allmen's [Letter] prompted Smith's independent investigation does not transcend Allmen's [Letter] to the level of being a motivating factor in Smith's termination decision."[139]  Therefore, Defendant argues that Plaintiffs have not shown a causal link between Plaintiffs' coworkers' racial animosity and Smith's decision to terminate them and that even if they did, Smith's independent investigation broke the causal link.[140]  Finally, Defendant argues that Plaintiffs cannot demonstrate pretext by questioning the schedule's accuracy or the correctness of Smith's conclusion because Smith relied on other information not challenged by Plaintiffs in the formation of his honest, good-faith decision to

---

[135]    (*Id.* at 9.)

[136]    (*Id.* at 12.)

[137]    (*Id.*)

[138]    (*Id.*)

[139]    (*Id.* at 13.)

[140]    (*Id.* at 14-15.)

terminate Plaintiffs.[141]

In their Sur-Reply, Plaintiffs state that they have affirmative evidence that Nallick's racial animus affected the Letter's composition: Allman based his information about Plaintiffs' work attendance on his personal knowledge, but on several of the nights he said he personally observed Plaintiffs' absence from work, he was not at work, but Nallick was.[142] Plaintiffs point to this discrepancy and the fact that Allman listened and nodded in agreement with Nallick's assertion that Plaintiff Harris would play the race card as evidence that they were both involved in the composition of the Letter.[143]

Additionally, Plaintiffs assert that "if the [termination] decision resulted from evidence compiled by those who harbored a discriminatory animus and the employers' response manifests indifference or unreasonableness in light of the facts the employer knew or should have known, the employer can still be found liable."[144] Therefore, Plaintiffs argue that Smith knew about the inaccuracies in the schedules upon which he relied, and summary judgment should be denied.[145]

## Plaintiff Reynolds

In its Motion, Defendant notes that Plaintiff Reynolds, a white female, must provide additional evidence to support the suspicion that Defendant is the "unusual employer who

---

[141]    (*Id.* at 15-16.)

[142]    (Pls.' Sur-Reply, D.E. # 55, at 7.)

[143]    (*Id.* at 8.)

[144]    (*Id.* at 10.)

[145]    (*Id.* at 9-10.)

discriminates against the majority."[146]  Thus, Defendant implies that Plaintiff Reynolds has not made out the first element of her prima facie case of race discrimination, as she is a majority plaintiff.  In support of Plaintiff Reynolds' reverse discrimination claim, Plaintiffs aver that she received high performance evaluations prior to complaining about how Nallick was treating Plaintiff Harris and argue that her subsequent termination in October of 2008 after she spoke to Schafer indicates a background or history of discrimination against the majority.[147]

The Court finds that Plaintiff Reynolds has failed to make out the first element of her prima facie case.  Plaintiffs have not presented evidence regarding Defendant's alleged background of discrimination against the majority.  Their assertion that Plaintiff Reynolds received high performance evaluations and was subsequently fired after speaking to Schafer is not sufficient evidence of Defendant's alleged past discrimination against the majority.  While that evidence relates to her retaliation claim, it has little bearing on her race discrimination claim.  Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff Reynolds' race discrimination claim is **GRANTED**.

### Plaintiff Harris

<u>Direct Evidence</u>

After weighing the factors set forth above, the Court finds that Plaintiff Harris has not put forth direct evidence of race discrimination because Nallick's comments amount to stray remarks.  First, Nallick was Plaintiff Harris' coworker rather than a supervisor.  He did not speak the remarks in Smith's presence, and Nallick was not involved in Smith's decision to terminate

---

[146]     (Def.'s Mot., D.E. # 43-1, at 15.)

[147]     (Pls.' Resp, D.E. # 76, at 13.)

Plaintiff Harris.  Although his involvement in the drafting and sending of the Letter is disputed, the Letter merely served as the catalyst for Smith's September 2008 investigation into Plaintiff Harris' alleged absence from work.  Smith did not rely on it in his decision to terminate Plaintiff Harris.  Furthermore, as indicated in *Staub*, Nallick is not Defendant's agent empowered with supervisory authority; instead, he was an employee with the same level of responsibilities as Plaintiff Harris.  Therefore, the Court finds that this first factor weighs against a finding of direct evidence of discrimination.

Second, whether Nallick's remarks form part of a pattern of biased comments appears ambiguous to the Court.  Nallick made ten or more comments to Plaintiff Harris before May of 2008, but he did not make additional comments to Plaintiff Harris himself after the June 2008 meeting with Schafer.  Even though he continued to make comments to other members of the Airbus workgroup, the comments were isolated from Plaintiff Harris.  Moreover, as discussed below, the Court finds that the "scab" statements made by Nallick are ambiguous, as they could be taken as racially biased or as biased against Plaintiff Harris' picket line crossing.  The Court finds that, on balance, this factor weighs against finding direct evidence of race discrimination.

Third, the remarks were made somewhat close in time to Plaintiff Harris' termination.  Plaintiff Harris alleged that Nallick made discriminatory statements for a six- to eight-month period, but the last discriminatory comment made to his face occurred in June of 2008.  Plaintiff Harris was terminated approximately two months later.  But Plaintiff Reynolds told Plaintiff Harris that Nallick continued to make similar comments after his June 2008 meeting with Schafer.  Accordingly, the Court finds that this factor weighs in favor of finding direct evidence of race discrimination.

Finally, Nallick's remarks as a whole are somewhat ambiguous. Referring to Plaintiff Harris as a scab, even with the accompanying curse words used by Plaintiff Harris, is not a comment with racial overtones; rather, it refers to his willingness to cross a union picket line. Although calling Plaintiff Harris a "scab nigger" one time was a racially-biased comment, the Court is unwilling to impute that racial bias to Nallick's other scab-related comments. Moreover, even though Plaintiffs argue that Nallick did not call Williams a scab, Nallick did not know about Williams' picket line crossing. Similarly, Nallick's other comments, such as calling Plaintiff Harris "you people," could relate to his picket line crossing or his race. In light of this ambiguity, the Court finds that this factor weighs against a finding of direct evidence of race discrimination.

On balance, given the relative ambiguity in Nallick's statements and Nallick's status as a coworker far removed from the decisionmaking process resulting in Plaintiff Harris' termination, the Court finds that Nallick's statements are stray remarks insufficient to demonstrate direct evidence of race discrimination. Therefore, the Court turns to the *McDonnell Douglas* analysis.

Circumstantial Evidence

The Court finds that Plaintiff Harris has failed to make out the elements of a prima facie case of race discrimination. He has not pointed to similarly situated employees who were treated differently as required by the fourth element of the prima facie case. Plaintiff Harris relies on Matney and Allman, who are both white, as employees similarly situated to him. The Court will assume that Matney and Allman, like Plaintiff Harris, missed work with permission.[148] However,

---

[148] For purposes of this specific analysis only, the Court will assume, in the light most favorable to Plaintiff Harris, that he missed work with permission. Although Matney and Allman were punished like Plaintiff Harris, their punishments differed. Plaintiff Harris was

the Court finds the number of days missed by these three individuals highly relevant to its analysis. Matney and Allman missed approximately three to four days of work, while Smith determined that Plaintiff Harris missed twenty-three days, nearly five times as many days off as Matney and Allman. This large difference in the number of days Plaintiff Harris missed, even if he had permission to miss them, causes him not to be similarly situated to Matney and Allman in all relevant aspects.

Additionally, the Court finds the time of year during which Matney, Allman, and Plaintiff Harris missed their days off work relevant as well. Matney and Allman missed time during the holidays; Plaintiff Harris took time off during the six-month period between February and June of 2008. During the December holiday season, it is not uncommon for employees to take additional time off, but the Court would not anticipate that employees would need to cover for each other during the first six months of the year, the only major holiday occurring during that time is Memorial Day in May. Accordingly, the timing of Matney and Allman's vacation days causes them not to be similarly situated to Plaintiff Harris in this regard as well.

Because Plaintiff Harris has not pointed to similarly situated employees other than Matney and Allman, the Court finds that Plaintiff Harris has failed to make out the fourth element of his prima facie case of race discrimination. Therefore, Defendant's Motion for Summary Judgment is **GRANTED** in this regard.

<u>**Retaliation**</u>

Title VII prohibits discrimination in employment on the basis of "race, color, religion,

---

terminated, but Matney and Allman were referred to internal discipline and were not terminated.

sex, or national origin."[149]  Title VII also prohibits retaliatory discrimination against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[150]  To make out a prima facie case of retaliation under § 2000e-3(a), a plaintiff must establish that:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.[151]

As to the first prong of this test, whether the plaintiff engaged in a protected activity, the Court must first consider whether the retaliation claim is based on an allegation that the employee participated in any proceeding under Title VII (the "Participation Clause") or opposed a practice declared discriminatory under Title VII (the "Opposition Clause") to determine the scope of review of the employer's alleged action.[152]  "The distinction between employee activities protected by the Participation Clause and those protected by the Opposition Clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings."[153]  Because Plaintiffs' Complaint alleges that they were terminated in 2008 for opposing Nallick's racist statements, the Court will evaluate

---

[149]    42 U.S.C. § 2000e-2(a)(1).

[150]    *Id.* § 2000e-3(a).

[151]    *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

[152]    *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

[153]    *Id.* at 1312.

51

Plaintiffs' retaliation claim under the Opposition Clause.  Summary judgment on retaliation

claims is appropriate where there are no genuine material facts at issue.[154]

The protection afforded under the Opposition Clause is significantly less than that

afforded under the Participation Clause.[155]  The Sixth Circuit uses a balancing test to balance

"the employer's recognized, legitimate need to maintain an orderly workplace and to protect

confidential business and client information, and the equally compelling need of employees to

be properly safeguarded against retaliatory actions."[156]  Under this test, the ultimate question is

whether the employee's actions were reasonable under the circumstances.[157]  Typical activities

protected under the Opposition Clause include "complaining about allegedly unlawful practices;

refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing

unlawful acts by persons other than the employer," including coworkers.[158]  Retaliation claims

relying on circumstantial evidence follow the *McDonnell Douglas* burden-shifting framework

set forth above.[159]

In its Motion, Defendant argues that neither Plaintiff can make out the second element of

their prima facie case.  It submits that Plaintiff Harris cannot show that Smith knew about his

---

[154]     *See Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 488-91
(6th Cir. 2011).

[155]     *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010).

[156]     *Id.* (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 722 (6th Cir. 2008)).

[157]     *Id.*

[158]     *Niswander*, 529 F.3d at 721.

[159]     *See Alexander*, 429 F. App'x at 488-89.

June 2008 meeting with Schafer and Nallick when he suspended him on October 8, 2008.[160] Nor can Plaintiff Reynolds show that Smith knew about her opposition, as she did not complain to any supervisor prior to her suspension.[161] Additionally, Defendant states that Plaintiffs cannot demonstrate the fourth element of their prima facie case, as no causal connection exists when the disciplinary process begins before the decisionmaker was aware of the protected complaint.[162] Defendant relies on the same legitimate, nondiscriminatory reason and pretext arguments as it raised in the context of race discrimination.[163]

In response, Plaintiffs assert that they can make out causation, as when Plaintiff Reynolds told Smith about the racial tension in the Airbus workgroup at the October 8, 2008, meeting, Smith had not yet made the decision to terminate Plaintiffs.[164] Plaintiffs also rely on temporal proximity to justify causation: they note that Smith was made aware of Plaintiffs' protected activity in the October 8, 2008 meetings, and they were terminated twenty days later on October 28.[165] In support of the second element of their prima facie case, Plaintiffs point out that no adverse action, other than being placed on suspension with pay, had been taken against Plaintiffs when Plaintiff Reynolds notified Smith of the alleged discrimination.[166] Plaintiffs also

---

[160]    (Def.'s Mot., D.E. # 43-1, at 18.)

[161]    (*Id.*)

[162]    (*Id.*)

[163]    (*Id.* at 19-21.)

[164]    (Pl.'s Resp., D.E. # 76, at 14.)

[165]    (*Id.* at 16.)

[166]    (*Id.* at 14.)

state that Smith's knowing reliance on an unreliable schedule would have violated Defendant's own guaranteed fair treatment policy.[167] They rely on the same pretext argument as they articulated for the race discrimination claim.[168] Additionally, Defendant's Reply and Plaintiffs' Sur-Reply contain the same arguments related to the prima facie case and pretext for their retaliation claims as for their race discrimination claims; thus, the Court will not recite them here.

The Court finds that both Plaintiffs engaged in opposition to their coworkers' statements which was reasonable under the circumstances, thereby satisfying the first element of their prima facie case. Plaintiffs each had a meeting with Schafer, their manager, regarding their feelings about the comments Nallick was making regarding Plaintiff Harris. Thus, they brought their concerns to the attention of Defendant's agent in a reasonable way, thereby engaging in protected activity and satisfying the first element of their prima facie case.

Because Plaintiffs spoke with Schafer, one of Defendant's managers and therefore one of its agents as implied in *Staub*, Defendant knew of their opposition to Nallick's comments, thereby satisfying the second element of a prima facie case. Even if Schafer was not Defendant's agent, Plaintiff Harris mentioned Nallick's comments to Smith during their October 8, 2008, meeting, and Smith found out about Plaintiff Reynolds' meeting with Schafer sometime after their October 8, 2008, meeting but before she was terminated on October 28, 2008. Additionally, Plaintiff Harris mentioned Nallick's comments in his post-October 8 statement to Smith. Therefore, because Smith learned about Plaintiffs' protected activity before he decided

---

[167]     (*Id.* at 15.)

[168]     (*Id.* at 17-24.)

to terminate them, the Court will give Plaintiffs the benefit of the doubt and find that they have satisfied the second element of their prima facie case. It is undisputed that Plaintiffs were terminated and that the third element of the prima facie case is satisfied. Therefore, the Court turns to the fourth element of Plaintiffs' prima facie case: causation.

The Court finds that temporal proximity is sufficient to satisfy Plaintiffs' causation element in this case. Plaintiff Harris was terminated twenty days after he informed Smith about his opposition to Nallick's racial comments; Plaintiff Reynolds was terminated sometime between eight and twenty days after Smith found out about her meeting with Schafer and her opposition to Nallick's treatment of Plaintiff Harris. While temporal proximity normally is not enough to satisfy the causation element, in this case, less than a month passed between Smith's knowledge of the protected conduct and Plaintiffs' termination. This short length of time renders Smith's knowledge temporally proximate to Plaintiffs' termination. Therefore, the Court finds that Plaintiffs have satisfied the fourth element of their prima facie case.

However, the Court finds that questions of fact remain as to Defendant's legitimate, non-discriminatory reason for terminating Plaintiffs. Plaintiffs state that they had permission to miss work based on Schafer's December 2007 meeting. The circumstances of that meeting and what was said during it are disputed. Moreover, the reliability and accuracy of the schedule is disputed, and Smith relied on archived copies of it in his evaluation. At trial, if Plaintiffs present evidence from which a reasonable jury could find that they had permission to miss the amount of work they missed, a jury could find that Defendant's reliance on those missed days to

terminate them would not be a legitimate reason for their termination.[169]  Therefore, Defendant's

Motion for Summary Judgment in this regard is **DENIED**.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 31, 2012.

---

[169]     *See McClain v. N.W. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 335-36 (6th Cir. 2006).