IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| MARIE ELAINE REYNOLDS and | | |
| THEODORE HARRIS, III, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 09-2692-STA-cgc |
| | ) | |
| FEDERAL EXPRESS CORPORATION | ) | |
| d/b/a FEDEX EXPRESS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION**
_____

Before the Court is Defendant's Motion for Reconsideration (D.E. # 79), filed on April 13, 2012. Plaintiffs filed a Response (D.E. # 83) on May 11, 2012. For the following reasons, Defendant's Motion is **GRANTED**.

**BACKGROUND**

Defendant filed its Motion for Summary Judgment on May 4, 2011. (D.E. # 43.) Following extensive briefing by the parties (D.E. # 46, 50, 51, 55, 57, 68, 69, 70, 73, and 74), the Court entered an Order Granting in Part and Denying in Part Defendant's Motion ("the Order"). (D.E. # 77.) In its Order, the Court addressed Plaintiffs' claims regarding 42 U.S.C. § 1981 and hostile work environment, race discrimination and cat's paw liability, and retaliation. In all, the Court addressed seven different issues. Ultimately, the Court granted summary judgment for Defendant on all claims except for both Plaintiffs' retaliation claims. Defendant's Motion to

Reconsider now before the Court requests reconsideration of the Court's ruling on Plaintiff Reynolds' retaliation claim. (D.E. # 79.)

In its Motion, Defendant argues that the Court ignored facts in the record when it concluded that Plaintiff Reynolds could make out a prima facie case of retaliation under Title VII. (Def.'s Mot., D.E. # 79, at 2.) It points out that Plaintiff Reynolds never had a meeting with Kurt Schafer ("Schafer"), her immediate manager in which she ever mentioned the racist statements of Roger Nallick ("Nallick"), her coworker, to Schafer. (*Id.* at 3.) Although Plaintiff Reynolds confronted Nallick about his vulgar language, Defendant contends that neither Schafer nor Mike Smith ("Smith"), her senior manager, knew about this confrontation. (*Id.* at 5.) Thus, Defendant argues that Plaintiff Reynolds cannot make out the first or second elements of her prima facie case: she did not engage in opposition protected by Title VII, and even if she did, Defendant did not know about it. (*Id.*)

Defendant also challenges the Court's holding regarding causation. It argues that because Smith had begun investigating Plaintiff Reynolds' absences from work in September of 2008, Defendant was already contemplating Plaintiff Reynolds' termination when she complained of Plaintiff Harris' racial harassment in her October 8, 2008 meeting with Smith. (*Id.* at 6.) Although Smith began Plaintiff Reynolds' suspension after the October 8, 2008 meeting, Defendant notes that it is undisputed that he did not know of any prior complaint of discrimination by either Plaintiff when he decided to suspend them. (*Id.* at 7.) Thus, Defendant implies that because Defendant had been contemplating whether to suspend or terminate Plaintiff Reynolds before the October 8, 2008 meeting, her opposition under Title VII does not support the causation element of her prima facie case. (*Id.* at 8.)

In response, Plaintiff Reynolds makes much of the fact that her suspension after her October 8, 2008 meeting with Smith was a non-punitive investigative suspension. (Pl.'s Resp., D.E. # 83, at 1-2.) She argues that because she had not been suspended before the October 8, 2008 meeting, the disciplinary process did not start before she complained to Smith about Plaintiff Harris' racial harassment.[1] (*Id.* at 2-6.) Plaintiff Reynolds cites to her deposition testimony and avers that she "did bring up the racially motivated stuff that was going on in the workgroup [when she told Smith about the alleged hostile work environment]." (*Id.* at 6.) Additionally, she argues that the day after she confronted Nallick about his comments, Nallick made a three-minute phone call to Schafer, thereby implying that Nallick informed Schafer about the confrontation. (*Id.* at 7.) Thus, Plaintiff Reynolds argues that she has successfully made out the first and second elements of her prima facie case of retaliation.

As to causation, Plaintiff Reynolds argues that Smith had not made a decision to terminate her when she told him about Nallick's racist comments. (*Id.* at 9.) Plaintiff Reynolds objects to Smith's affidavit testimony that he was "contemplating termination" when he suspended her because it is inconsistent with his deposition testimony that he did not know what his intentions were, but she relies on evidence that was not before the Court at summary judgment. (*See id.*) The Court will further address this objection below. Plaintiff Reynolds also addresses the cases cited by Defendant and distinguishes them from her situation because she opposed Nallick's racially-tinged comments before she was placed on suspension. (*Id.* at 10-16.)

---

[1] Plaintiff Reynolds also attached an Affidavit and other evidence to her Response and urges the Court to rely on it as it evaluates Defendant's Motion. However, the Court is evaluating whether it properly decided Defendant's Motion for Summary Judgment; as such, its review is limited to the information available to it when it decided Defendant's Motion for Summary Judgment.

**STANDARD OF REVIEW**

While the "Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders, . . . [d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment."[2] The Sixth Circuit has recognized that "[t]raditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."[3]

Moreover, the Western District of Tennessee has enacted Local Rule 7.3 ("L.R. 7.3"), which governs Motions for Revision of Interlocutory Orders. L.R. 7.3 identifies Rule 54(b) as the relevant procedural rule under which to bring a Motion for Reconsideration, and it also notes that "[m]otions to reconsider interlocutory orders are not otherwise permitted."[4] In addition to the Sixth Circuit's requirements, the Western District of Tennessee also requires Motions for Reconsideration to specifically show one of three elements:

> (1) a material difference in fact or law from that which was presented to the Court before entry of the interlocutory order for which revision is sought, and that in the exercise of reasonable diligence the party applying for revision did not know such fact or law at the time of the interlocutory order; or (2) the occurrence of new material facts or a change of law occurring after the time of such order; or (3) a manifest failure by the Court to consider material facts or dispositive legal arguments that were presented to the Court before such interlocutory order.[5]

---

   [2]   *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (quotation omitted).

   [3]   *Id.* (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998)).

   [4]   L.R. 7.3(a).

   [5]   L.R. 7.3(b).

Notably, L.R. 7.3 prohibits parties' Motions for Reconsideration from "repeat[ing] any oral or written argument made by the movant in support of or in opposition to the interlocutory order that the party seeks to have revised."[6]

## ANALYSIS

The parties have identified two methods which would allow Plaintiff Reynolds to try to make out a prima facie case of retaliation under Title VII.  First, Plaintiff Reynolds could rely on her conversation with Nallick in which she confronted him about his statements about Plaintiff Harris.  Similarly, she could rely on her conversation with Schafer about the "extreme language" spoken in her unit.  As discussed below, neither of these theories would satisfy the first element of a prima facie case of retaliation.  Second, Plaintiff Reynolds could rely on her October 8, 2008 meeting with Smith, during which she mentioned Nallick's racist comments "at some point."  As discussed below, this theory is unavailing as well, and it would not satisfy the fourth element of her prima facie case of retaliation.[7]

Because the Court discussed Title VII's retaliation framework thoroughly in the Order, the Court hereby incorporates that framework by reference.[8]  However, the Court will reiterate

---

[6]    L.R. 7.3(c).

[7]    As a threshold issue, the Court arrives at these theories because the Order relied on facts unsupported by the record regarding Plaintiff Reynolds' retaliation claim.  Plaintiff Reynolds did not have a meeting with Schafer during which she mentioned Nallick's racist comments about Plaintiff Harris.  (Dep. of Pl. Reynolds, D.E. # 43-3, at 18-21.)  Therefore, the premise upon which the Court built its holding regarding Plaintiff Reynolds' retaliation claim was faulty, and the Court will begin again by examining the arguments put forth by the parties in which Plaintiff Reynolds could make out a prima facie case of retaliation.  Additionally, the Court notes that Defendant did not challenge its holding that questions of fact remains as to its legitimate nondiscriminatory reason for terminating Plaintiffs.

[8]    (Order, D.E. # 77, at 50-52.)

the elements of a prima facie case of retaliation: (1) participating in an activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.[9] Additionally, "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."[10] Furthermore, "a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."[11] Accordingly, the sole adverse employment action upon which Plaintiff Reynolds can rely is her termination; Smith's October 6 or 7, 2008 decision to place her on an investigative suspension at the October 8, 2008 meeting would not support a retaliation theory.

In *Breeden*, the plaintiff's supervisor mentioned to another supervisor that she was contemplating transferring the plaintiff to a different position.[12] The next day, the defendant was served with a summons and complaint regarding the plaintiff's EEOC lawsuit, and the supervisor filed an affidavit noting that she did not become aware of the lawsuit until that day.[13] Accordingly, although the defendant transferred the plaintiff one month after learning of the lawsuit, the Supreme Court held that the plaintiff could not rely on the filing and service of her

---

[9] *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

[10] *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam).

[11] *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004).

[12] *Breeden*, 532 U.S. at 271-72.

[13] *Id.* at 272.

EEOC lawsuit for causation purposes because the defendant was contemplating her transfer before it received notice of her EEOC lawsuit.[14] When the adverse employment action was planned prior to the plaintiff's protected activity, it will not suffice to establish the required causal connection.[15] Similarly, when a plaintiff's placement on a performance improvement plan occurred before the plaintiff's protected activity but his termination pursuant to the performance improvement plan occurred after the protected activity, the termination will not constitute evidence of causation.[16]

### Plaintiff Reynolds' Confrontations Regarding Nallick's Language

Although Plaintiff Reynolds was placed on investigative suspension in the early morning of October 8, 2008, the letter regarding her suspension was dated October 7, 2008.[17] Before October 7 or 8, 2008, Plaintiff Reynolds had not made any complaint to a member of Defendant's management or human resources departments about racial discrimination on the job.[18] However, Plaintiff stated that she "somewhat" complained about the hostile work environment on the job. In full, she said:

> Somewhat. And I say somewhat because of the language that was going on. And I mean extreme language. So [Schafer] was aware of that. So much aware that he

---

[14]   *See id.*

[15]   *See Reynolds v. Extendicare Health Servs., Inc.*, 257 F. App'x 914, 919-20 (6th Cir. 2007).

[16]   *See Baker v. Medtronic, Inc.*, No. 1:07-cv-00286, 2009 WL 298800, at *9 (S.D. Ohio Apr. 2, 2009). In *Baker*, the plaintiff knew that he could be terminated for failing to comply with the terms of the performance improvement plan. *Id.*

[17]   (Dep. of Pl. Reynolds, D.E. # 43-3, at 18.) The Court will cite to the ECF page numbers of Plaintiff Reynolds' deposition.

[18]   (*Id.* at 19.)

> even sent an email out saying to watch the language when the vice presidents were coming on—on the property or on the—the floor.[19]

Plaintiff Reynolds also stated that "Nallick had the foulest mouth [she'd] ever heard in [her] life, and . . . he actually used vulgar language on the phone while doing his job."[20] While she reported Nallick's foul language to Schafer "probably once" in early November of 2007, Plaintiff Reynolds did not complain to Schafer that Nallick was using any racist language, nor did she report his vulgar language to anyone else.[21] Plaintiff Reynolds also confronted Nallick about the names he called Plaintiff Harris, such as "piece of shit scab," "mother f-----g scab," derogatory statements about Plaintiff Harris' job performance, and Nallick's statement that he could not believe that Plaintiff Harris still worked for Defendant.[22] The day after this confrontation, Nallick made a three-minute phone call to Schafer.[23] The next month, Schafer began to question Plaintiff Reynolds about her whereabouts, which he had not done previously.[24]

"It is easy to forget . . . that Title VII deals with discrimination in the workplace, not morality or vulgarity."[25] And Title VII is not "a general civility code for the American

---

[19] (*Id.*)

[20] (*Id.* at 20.)

[21] (*Id.* at 20-21.)

[22] (Order, D.E. # 77, at 7.)

[23] (*Id.*)

[24] (*Id.*)

[25] *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 519 (6th Cir. 2001).

workplace."[26]  Although verbal comments may be offensive, inappropriate, extreme, or unprofessional, their mere vulgarity is insufficient to make them actionable under Title VII.[27]  Thus, for Plaintiff Reynolds to have engaged in protected conduct—here, opposing Nallick's statements by complaining about them—the statements would need to be related to unlawful discrimination under Title VII.[28]

But the Court already held that Nallick's remarks were not direct evidence of race discrimination.[29]  Furthermore, after reviewing the inferences to be drawn from Nallick's remarks, the Court found that his statements were "somewhat ambiguous."[30]  Thus, Plaintiff Reynolds' opposition to Nallick's statements alone is insufficient to find that she engaged in protected activity under Title VII's Opposition Clause.  Plaintiff's confrontation of Nallick about his extreme, vulgar language, without similarly confronting him about his racist comments, does not constitute protected activity under Title VII.  Moreover, even if her confrontation with Nallick was protected activity, the Court finds that Plaintiff could not make out the second element of her prima facie case.  Plaintiff Reynolds relies on a three-minute phone call from Nallick to Schafer the day after her confrontation as proof that Defendant, Schafer's principal, knew about her opposition to Nallick's statements.  However, even taking all inferences of that conversation in the light most favorable to Plaintiff Reynolds, the Court cannot stretch the

---

[26]  *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

[27]  *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

[28]  *See Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010).

[29]  (Order, D.E. # 77, at 47-49.)

[30]  (*Id.* at 49.)

significance of the phone call that far. Accordingly, Plaintiff Reynolds' prima facie case fails under this theory.

The Court now turns to Plaintiff Reynolds' second conversation regarding Nalick's statements. Similarly, Plaintiff Reynolds' conversation with Schafer regarding Nallick's extreme, vulgar language does not satisfy the first element of her prima facie case of retaliation: she did not report that Nallick had made any racially-charged statements. Therefore, because Plaintiff Reynolds did not report that Nallick made any racist statements, and she opposed only his vulgar language (which the Court has found to be "somewhat ambiguous"), she did not engage in protected activity by telling Schafer about Nallick's vulgar language. Therefore, she cannot make out the first element of her prima facie case of retaliation under this second theory. Accordingly, Plaintiff Reynolds must rely upon comments she made at her meeting with Smith if she is to make out a prima facie case.

## Plaintiff Reynolds' Meeting with Smith

Plaintiff Reynolds' meeting with Smith satisfies the first three elements of her prima facie case of retaliation. First, she informed Smith of Nallick's racial epithets, thereby complaining about discriminatory statements in the workplace and engaging in protected activity. Second, Defendant knew about her opposition because Smith is one of its senior managers, and as Defendant's agent, his knowledge is imputed to Defendant. Third, Plaintiff Reynolds was ultimately terminated, and she suffered an adverse employment action. Therefore, whether Plaintiff Reynolds will proceed to trial on her retaliation claim depends upon whether she can make out the fourth element of her prima facie case—causation.

In his deposition, Smith stated that, at the time he wrote Plaintiff Reynolds' suspension letters, he had not decided to terminate Plaintiff Reynolds.[31] He also did not know about any prior complaints of discrimination that she had made.[32] However, in his Affidavit, Smith indicated that he "was contemplating the possibility of further discipline, including termination, pending the conclusion of [his] investigation" when he decided to suspend Plaintiff Reynolds.[33] Plaintiff Reynolds makes much of this alleged change in testimony and asserts that, because Smith's Affidavit conflicts with his deposition testimony, the Court should disregard the Affidavit and instead rely only on Smith's deposition testimony.

But Plaintiff Reynolds' objection relies on the assertion that Smith stated that he "[did not] know" what his intentions were at the October 8, 2008 meeting.[34] This reliance is problematic for at least three reasons. First, as noted above, Plaintiff Reynolds did not provide these interview notes at summary judgment; therefore, they were not before the Court at that time. Second, whether Smith's response that he did not know what he intended to do at the time of Plaintiff Reynolds' protected activity is ambiguous at best. According to the interview notes, Plaintiff Reynolds stated, "I want to know what your intentions are before I write out my

---

[31] (Dep. of Smith, D.E. # 46-15, at 67.) Smith had also "developed suspension letters and interview questions for [Plaintiff Reynolds]" by October 6, 2008, two days before his meeting with Plaintiff Reynolds. (Aff. of Smith, D.E. # 43-13 at 12.) Therefore, Smith's notes indicate that he made the decision to suspend, rather than to terminate, Plaintiff Reynolds before she engaged in protected activity.

[32] (Aff. of Smith, D.E. # 43-13, at 7.)

[33] (*Id.*)

[34] (Interview Notes, D.E. # 83-1, at 13.)

11

statement. Did [Schafer] print out the schedules monthly?"[35] In response, Smith stated, "I don't know."[36] From Plaintiff Reynolds statements, two possibilities emerge: Smith could not have known what his intentions were or he could not have known whether Schafer printed out the schedules on a monthly basis. Third, at Smith's deposition, Plaintiff Reynolds' counsel did not ask Smith what actions he was considering before his meeting with her; therefore, his failure to mention which punishments he was contemplating is hardly surprising.

Accordingly, the Court finds that its reliance on the interview notes presented by Plaintiff Reynolds in her Response to Defendant's Motion to Reconsider would be improper because they were not before the Court at summary judgment. Additionally, the Court finds that Smith's Affidavit does not conflict with his deposition testimony. Because Plaintiff Reynolds' counsel did not ask Smith what actions he was contemplating before the October 8, 2008, his supplementation of his deposition testimony with the Affidavit stating as such was not improper. Moreover, both his deposition transcript and Affidavit were before the Court at summary judgment.

Furthermore, Plaintiff Reynolds' arguments miss the mark. The salient inquiry under *Breeden* is not when Plaintiff Reynolds learned of her suspension but when Defendant began contemplating its adverse employment action. Moreover, Plaintiff Reynolds' attempts to factually distinguish *Breeden* are unavailing: the Sixth Circuit cases which cite *Breeden* unilaterally apply its holding regardless of the type of adverse employment action being contemplated. Thus, it appears from the Court's further examination of the record that Plaintiff

---

[35] (*Id.*)

[36] (*Id.*)

Reynolds did not have a meeting with Schafer before her October 8, 2008 meeting with Smith at which she mentioned Nallick's racially-charged comments. It also appears to the Court that Smith had made the decision to suspend Plaintiff Reynolds before their October 8, 2008 meeting. However, Smith had not made the decision to terminate Plaintiff Reynolds at the time of their meeting, although he was contemplating a number of possible paths depending on the results of his investigation, including termination. Additionally, as indicated by the Smith's letter to Plaintiff Reynolds dated October 7, 2008, Smith had decided to place Plaintiff Reynolds on suspension before he found out about her protected activity. Accordingly, under Supreme Court precedent as discussed above, the Court finds that Plaintiff Reynolds' protected activity, which occurred between Smith's contemplation of terminating her and her actual termination, does not satisfy the causation element. Thus, if Plaintiff Reynolds is to survive summary judgment on her retaliation claim, she must present causation evidence other than temporal proximity.

In her Response to Defendant's Motion for Summary Judgment, Plaintiff Reynolds argued that "Smith's failure to acknowledge favorable evidence along with the temporal proximity between Plaintiffs' reports and their termination establish that the causal connection element is satisfied."[37] Additionally, she asserted that "the mere [twenty] day time period from the date Plaintiffs made known to Smith their complaints of discrimination[,] coupled [with] other indicia of retaliatory evidence such as Smith's utter lack of recognition of favorable evidence regarding discrimination in the workplace and the fact that the schedule he relied upon to cause Plaintiffs['] termination is unreliable[,]" meets her causation burden.[38]

---

[37] (Pls.' Resp., D.E. # 76, at 16.)

[38] (*Id.* at 17.)

13

The Court finds that this evidence is insufficient to meet Plaintiff Reynolds' burden as to causation. When the Court removes temporal proximity from its causation analysis, it is left with Smith's reliance on an allegedly unreliable schedule as proof of causation. However, Smith stated that he conducted an independent investigation, and he based his decision on whether to fire Plaintiff Reynolds on more than the schedule. He also relied on proxy card access and computer log-in information. Accordingly, his "failure to acknowledge favorable evidence," without more, is not enough to demonstrate causation, and Plaintiff Reynolds cannot make out a prima facie case of retaliation. The Court hereby **GRANTS** Defendant's Motion to Reconsider, **RECONSIDERS** its prior ruling on her retaliation claim, and **GRANTS** Defendant's Motion for Summary Judgment as to that claim. Therefore, Plaintiff Reynolds has no more viable claims remaining, and she will not proceed to trial.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Reconsideration is **GRANTED**. The sole claim remaining for trial is Plaintiff Harris' retaliation claim. However, trial is currently set to begin on Monday, July 30. The Court has a criminal trial set to begin on Monday, July 23, and that trial is expected to last six to eight days. Accordingly, the Court must reschedule trial in this case due to that conflict, but the continuance will be very brief. Trial shall be reset by separate setting letter.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: June 7, 2012.

15